## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

DOROTHY MARIE PELANEK,   )
   )
     Plaintiff,   )
   )
v.   )     **CIVIL ACTION NO. 1:11-00078**
   )
MICHAEL J. ASTRUE,   )
Commissioner of Social Security,   )
   )
     Defendant.   )

### M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security

denying Plaintiff's application for Disability Insurance Benefits (DIB), under Title II of the Social

Security Act, 42 U.S.C. §§ 401-433. This case is presently pending before the Court on the

Plaintiff's Motion for Judgment on the Pleadings and for Remand (Document No. 9.) and

Defendant's Motion for Judgment on the Pleadings. (Document No. 15.) Both parties have

consented in writing to a decision by the United States Magistrate Judge. (Document Nos. 3 and 4.)

The Plaintiff, Dorothy Marie Pelanek, (hereinafter referred to as "Claimant"), filed an

application for DIB on September 27, 2008 (protective filing date), alleging disability as of June 13,

2007, due to

> Left UE Brachial Plexus Nerve Traction Injury, Neck injury/sprain and cervical spur,
> shoulder injury - biceps tenotomy/tenodesis, L wrist - derangement + ulna variance,
> impaction, L4/5 foraminal protrusion and annular tear, Disc desiccation and
> degenerative disc T9-L5, Disc bulging on right L3 nerve root, Migraines, Causalgia
> Type II/CRPS, MS MS started ~ 1985. Work was more difficult but not impossible.
> I use prednisone for exacerbations. In 1998 I suffered a back/neck injury but kept
> working. Back pain is constant; just varies in intensity. In 7/2001 I experienced a
> severe Neck/LUE work injury. Causalgia/CRPS developed. In 6/2007 I stopped work
> for shld surgery at Duke; have been off work since. A Duke wrist surgeon has
> recommended major L wrist surgery with conservative management at present. Pain

increases the migraines. Brachial plexus inj shld and wrist inj ms rsda disc desea.

(Tr. at 18, 213-15, 249.) The claim was denied initially and on reconsideration. (Tr. at 134-36, 140-42.) On April 29, 2009, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 146-47.) The hearing was held on July 20, 2010, before the Honorable Steven A. De Monbreum. (Tr. at 43-69.) By decision dated July 29, 2010, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 18-31.) The ALJ's decision became the final decision of the Commissioner on January 8, 2011, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) On February 2, 2011, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2010). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the

claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2010). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to,

3

chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change

deemed severe, the SSA compares the medical findings about the severe impairment(s) and the

rating and degree and functional limitation to the criteria of the appropriate listed mental disorder

to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§

404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental

impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the

Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The

Regulation further specifies how the findings and conclusion reached in applying the technique must

be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written
> decision issued by the administrative law judge and the Appeals Council must
> incorporate the pertinent findings and conclusions based on the technique. The
> decision must show the significant history, including examination and laboratory
> findings, and the functional limitations that were considered in reaching a conclusion
> about the severity of the mental impairment(s). The decision must include a specific
> finding as to the degree of limitation in each of the functional areas described in
> paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2) (2010).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because

she had not engaged in substantial gainful activity since June 13, 2007, her alleged onset date. (Tr.

at 20, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from

"multiple sclerosis; left brachial plexus injury; degenerative disc disease/sprain of the spine;

headaches; and left shoulder and wrist injury[,]" which were severe impairments. (Tr. at 20, Finding

No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairment did not meet or equal

---

in the environment would cause decompensation; or (3) a current history of 1 or more years'
inability to function outside a highly supportive living arrangement, and the indication of a
continued need for such an arrangement.

the level of severity of any listing in Appendix 1. (Tr. at 22, Finding No. 4.) The ALJ then found that

Claimant had a residual functional capacity for light exertional work as follows:

> [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). The claimant would be able to lift and carry including upward pulling up to 20 pounds occasionally and 10 pounds frequently; stand/walk for 6 hours in an 8-hour period; sit for 6 hours in an 8-hour period; and occasionally stoop, bend, crawl, crouch, kneel, balance, and climb ramps or stairs, but never climb ladders, ropes, or scaffolds. Her dominant hand is the right hand and she would have no limitations with this upper extremity; however, she would need to avoid reaching overhead with the left upper extremity due to brachial plexus injury and status post left shoulder surgery. She would need to avoid concentrated exposure to extreme cold, vibration, hazardous machinery, and heights.

(Tr. at 22-23, Finding No. 5.) At step four, the ALJ found that Claimant could not return to her past

relevant work. (Tr. at 28, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE")

taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as an

usher, a conveyor line bakery worker, and a furniture retail consultant, at the light level of exertion.

(Tr. at 29-30, Finding No. 10.) The ALJ noted however, that on August 13, 2009, Claimant's age

category changed. (Tr. at 30, Finding No. 11.) Accordingly, the ALJ found that prior to August 13,

2009, Claimant was not disabled and could perform other jobs that existed in significant numbers

in the economy, but became disabled on August 13, 2009, and continued to be disabled through the

date of the decision. (Tr. at 30, Finding No. 12.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying

the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was

defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct

a verdict were the case before a jury, then there is 'substantial evidence.'
Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on February 13, 1955, and was 55 years old at the time of the administrative hearing, July 20, 2010. (Tr. at 30, 48, 213.) Claimant had a high school education with four or more years of college, and was able to communicate in English. (Tr. at 29, 48, 248, 269.) In the past, she worked as an occupational therapist. (Tr. at 29, 62, 250-52.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will summarize it below in relation to Claimant's arguments.

***Dr. Charles S. McClung, D.O.***:

The medical reflects evidence of Claimant's treating with Dr. McClung on July 9, 2002. (Tr. at 812, 849.) By letter dated July 9, 2002, to attorney Norris Kantor, Dr. McClung advised that he had been Claimant's physician since the time of her accident at Walmart on October 5, 1998. (Id.) Claimant had been involved in an accident wherein a "traveling grocery buggy" hit her as she was

stooping down to examine an item. (Tr. at 403, 410, 812, 849.) Claimant landed forward and to the right on her hands and knees after having been struck by the buggy in the left lower back and sacral and hip area. (Tr. at 812, 849.) Dr. McClung noted that since that time, MRIs revealed annular bulging of the L4-5 disc with some tear of the annular fibrosis. (Id.) He opined that "this type of injury occurs as a result of direct trauma as opposed to prolonged exposure to stress-causing degenerative change due to the fact that the MRI's showed up essentially normal in all other areas." He noted that Claimant had continued episodic symptoms in the left lumbar area which varied from mild to debilitating for several days at a time, associated with weakness and transient paresthesias in her left lateral leg. (Id.) He further opined that Claimant would require lifelong care involving periodic and frequent osteopathic manipulation and occasional injections into the strained lumbar area. (Id.) Finally, he opined that it was "not unforeseeable that in the distant future it may continue to tear from this initial injury and cause progression of symptoms." (Id.) Dr. McClung reported that he would provide continuous care on a monthly basis. (Id.)

The treatment notes from Dr. McClung are difficult to decipher and usually include checked items on preprinted form with limited comments. On October 4, 2007, Claimant complained that her left wrist continued to bother her. (Tr. at 834.) On September 29 and October 20, 2008, Claimant reported left clavicle, left upper extremity, and left wrist pain. (Tr. at 788, 825.) On September 29, 2008, she also reported that "[t]hey said I didn't have left arm neuropathy." (Id.) On November 26, 2008, Claimant noted that she took prednisone about one week earlier for shoulder pain, for five days. (Tr. at 777, 935.) On December 10, 2008, Claimant reported that she experienced numbness, whiteness, and swelling of her left hand. (Tr. at 934.) On January 12, 2009, Claimant reported that increased housework resulted in increased left upper extremity pain. (Tr. at 639, 933.) Dr. McClung

noted that Claimant's left hand grip was weak and weak 4/5 left shoulder abduction. (Id.)

On February 15, 2009, Claimant completed a form at the McClung Health & Wellness Center on which she stated that her pain was in the left upper extremity, worse at the wrist, posterior arm, and shoulder. (Tr. at 931.) She also stated that her medication helped but not as much as usual, that the medication provided three hours of relief with each dose but she noted that it "was not relief just reduction of pain," and that her pain with medication was at a level 8 or 9 out of ten without medication and at level 7 or 8 with medication. (Id.) On February 16, 2009, Claimant complained of continued left upper extremity pain that had "been killing [her] the past 3 days." (Tr. at 930.)

By letter dated February 16, 2009, to the West Virginia Workers' Compensation Division, Dr. McClung noted Claimant's reports of "unrelenting shoulder, arm, and wrist pain." (Tr. at 923.) Claimant stated that her wrist was becoming progressively weaker and she was unable to do her occupational therapy job. (Id.) Dr. McClung noted that the medications, including Lyrica, Prednisone, Soma, and Dilaudid helped on days of severe pain but only to a minimal extent when taken three or four times a day. (Id.) Dr. McClung opined that Claimant did suffer as a direct result of her work-related injury and noted that she had undergone seven and a half years of aggressive therapy including consultations with specialists. (Id.) He stated that Claimant had "suffered with this pain to the extent that it has almost debilitated her from her normal activities of daily living." (Id.) Although not diagnosed, Dr. McClung noted that it appeared she had all the classic signs of causalgia with a secondary depression associated with chronic injury and pain. (Tr. at 924.)

Dr. McClung also completed a "Routine Abstract Form - Physical" on February 16, 2009, on which he indicated that Claimant's 4/5 left grip strength and 5/5 right grip strength, that she had arthritis in her left wrist with limited range of motion, and that she could make a fist, button clothing,

9

and tie a shoestring, but could not pick up coins with her left hand. (Tr. at 926.) Dr. McClung also indicated that Claimant did not have normal reflexes, sensation, or motor strength in her left upper extremity. (Tr. at 927.)

On June 10, 2009, Dr. McClung wrote another letter to Workers' Compensation in which he expressed his appreciation for her efforts in caring for Claimant. (Tr. at 958-59.) He noted that Claimant continued to have pain in her left humeral area and he opined that she had persistent tenderness along the triceps groups in the proximal lateral humerus. (Tr. at 958.) Dr. McClung noted that he recommended that Claimant continue off work until complete resolution of findings in her left shoulder and upper extremity. (Id.) He also advised that Claimant was "probably doing as best she has in quite some time and I really would like to see her continue to improve." (Tr. at 959.) He also advised that there was "still plenty of room for improvement." (Id.)

On July 13, 2009, Dr. McClung completed a form Medical Assessment of Ability to Do Work Related Activities (Physical). (Tr. at 960-63.) He opined that Claimant could lift and carry less than ten pounds occasionally and indicated that she could not lift and carry any weight frequently. (Tr. at 960.) He also opined that Claimant could stand and walk less than one hour total in a workday, sit less than two hours total in a workday, and needed to alternate from a sitting position every ten to fifteen minutes and from a standing position every five to ten minutes. (Tr. at 960-61.) He indicated that Claimant needed to lie down sometimes at unpredictable intervals during a workday. (Tr. at 961.) He based these assessments on Claimant's multiple sclerosis and left upper extremity neuropathy. (Id.) He further opined that Claimant could never perform any postural activities for the same reasons, in addition to chronic low back pain with left lower extremity weakness. (Tr. at 961-62.) He also indicated that Claimant's ability to reach, handle, feel, push, and

pull was affected by her multiple sclerosis in that she could not feel heat or cold most of the time in her hands. (Tr. at 962.) Finally, Dr. McClung opined that Claimant would miss work more than three times a month due to her impairments. (Tr. at 963.)

In a medical note dated October 6, 2009, Claimant reported increased aches with cool weather and left forearm and wrist pain. (Tr. at 981.) On November 9, 2009, Dr. McClung noted that Claimant's left trapezius muscle got sore and therefore, it was hard for her to lift and move things. (Tr. at 980.) He also noted that Claimant had a weak left shoulder shrug, tenderness in the left lateral epicondyle, and that the skin of her left upper extremity was pale, cool, and dry. (Id.)

In a letter dated May 18, 2010, to Workers' Compensation, Dr. McClung noted that Claimant had been seen by Dr. Ruch at Duke University and had a successful injection into her left wrist with significant reduction in pain and improvement in motion. (Tr. at 1054.) Dr. Ruch diagnosed biceps tendinitis with some question of a causalgia. (Id.) He ordered a MRI, which revealed a partial tear of the lateral triceps of the left upper extremity. (Id.) Dr. McClung noted that Claimant's medications included Soma 350mg three times a day, Prednisone 5mg daily as needed, Dilaudid 4mg twice daily as needed for acute pain, Phenergan 25mg as needed for nausea, and Flexeril 10mg twice daily for spasms in the left shoulder or girdle left scapular area and left upper extremity. (Id.) He also noted that Claimant's physical therapy for the brachial plexus strain and subsequent injury was unsuccessful. (Id.) He further noted that Claimant had been using a TENS unit, for which he requested supplies. (Id.) Dr. McClung opined that Claimant "continues to have significant disuse of her left upper extremity and requires additional therapies and evaluation." (Tr. at 1055.) He further opined that the independent evaluations by Drs. Kropac and Mir were "cursory exams at best" and requested a further consultation with a physician he considered "well versed in the

11

Workers' Compensation programs and has experience in the specialty of neuromusculature skeletal medicine." (Id.)

***Dr. J. Gordon Burch, M.D.***:

Dr. Burch, a neurologist, conducted a neurological examination and consultation of Claimant on February 3, 2009. (Tr. at 920-22, 1038-40.) Dr. Burch first noted that Claimant first experienced symptoms of multiple sclerosis 1986, at which time she suffered two episodes of Lhermitte's phenomena. (Tr. at 922, 1038.) He noted that Claimant essentially managed her symptoms herself with courses of steroids to suppress symptoms and declined recommended immunoregulatory therapy. (Id.) He next noted that Claimant injured her lumbosacral back in 1998, and had back pain since then with varying levels of intensity and disablement. (Tr. at 923, 1039.) Third, Dr. Burch noted a left brachial plexus injury by sprain strain mechanism in 2001, which resulted in continued left shoulder and arm pain. (Id.) Fourth, Dr. Burch noted that Claimant fell down stairs in 2004 and struck her posterior cervical and thoracic regions, for which she continued to have thoracic level back pain and neck pain. (Id.) He further noted a history of migraine headaches of varying intensity and frequency, bladder and sinus infections that were treated by medication, and a 2007 foot and ankle surgery and should arthroscopy. (Id.) Dr. Burch stated that Claimant reported problems "in virtually all systems." (Id.)

Dr. Burch completed a "comprehensive neurologic examination," which was "normal in all respects except for very mild weakness at the left deltoid and optic nerve pallor temporarily on the left." (Id.) Apart from the left deltoid weakness, Claimant's muscle strength, tone, and bulk in all extremities was normal. (Tr. at 923, 1040.) Her motor coordination was normal and there was no evidence of cerebellar dysfunction and sensation was intact. (Id.) Dr. Burch noted that Claimant had

a long history of multiple sclerosis and that it had been "remarkably stable without specific treatment in place and appears to be relatively nonsignificant in terms of her major current complaints. (Id.) He noted that Claimant's major current complaint was thoracic level pain, left shoulder and arm pain, and neck pain. (Id.) He recommended a MRI study of the thoracic spine. (Id.)

On March 11, 2009, Dr. Burch noted that Claimant had an established diagnosis of multiple sclerosis which had been "relatively inactive or quiescent." (Tr. at 939, 967.) He also noted that she had a history of left brachial plexus injury with pain in the left arm which suggested a sympathetic mediation of pain. (Id.) He finally noted that Claimant was "stable without new problems or diagnoses." (Id.) A MRI of Claimant's lumbar spine on March 24, 2009, revealed relatively mild disc disease and mild degenerative changes and mild facet degenerative changes throughout the lumbar spine. (Tr. at 972-73, 991-92.) Dr. Burch noted that the MRI was "fairly unremarkable." (Tr. at 940, 985.) The MRI of her brain revealed fairly numerous white matter findings consistent with known multiple sclerosis and lesions within the corpus callosum and diffuse thinning of the corpus callosum that supported longstanding multiple sclerosis. (Tr. at 940, 974-75, 989-90.) The MRI of her thoracic spine revealed no abnormal encroachment but identified multiple lesions within the thoracic cord. (Tr. at 976.) On March 30, 2009, Dr. Burch advised that Claimant's multiple sclerosis "for the most part has been relatively inactive or quiescent for some time." (Tr. at 940, 985.) He noted that Claimant's MRI of the thoracic spine revealed lesions consistent with multiple sclerosis plaques in the cord, though none were judged to have been new. (Id.) He believed that the thoracic cord disease "may explain some of her lateral flank pain as well as the midback pain that she has noted." (Id.) Dr. Burch noted that Claimant's neurological examination was "as documented at first visit" and changed her medication. (Tr. at 941, 986.)

13

Dr. Burch again saw Claimant on July 22, 2009, noted that Claimant's multiple sclerosis had been relatively inactive and that her neurological examination was encouraging despite her extensive litany of complaints. (Tr. at 987.) He noted that Claimant had normal strength in the extremities. (Id.) On November 24, 2009, Dr. Burch noted that Claimant's multiple sclerosis had generally been inactive clinically but produced "variable symptoms fluctuating in time." (Tr. at 982.) He noted that he had recommended a trial of immunoregulatory therapy. (Id.) Claimant reported continued muscle pain and spasms in the limbs which had increased in intensity the recent weeks and also thoracic pain and back pain radiating into the left leg. (Id.) Dr. Burch's neurological exam was normal. (Tr. at 988.)

On March 12, 2010, Dr. Burch noted that Claimant's neurological examination and mental status were normal. (Tr. at 1043, 1047.) Sensation, gait, stance, and strength were all normal. (Tr. at 1043-44, 1047-48.) She was able to heel and toe walk and rise from a chair without difficulty. (Tr. at 1044, 1048.) Dr. Burch noted that Claimant was a "very complicated patient with multiple sclerosis." (Id.)

On July 19, 2010, the day preceding Claimant's administrative hearing, Dr. Burch completed a form Medical Assessment of Ability to Do Work-Related Activities (Physical). (Tr. at 1140-42.) Dr. Burch opined that Claimant could lift and carry ten pounds on an occasional basis and less than ten pounds on a frequent basis, walk or stand about two hours in an eight-hour day, could sit about four hours and in eight-hour day, sit for twenty minutes before changing position, stand for about ten minutes before changing position, and never perform any postural activities. (Tr. at 1140-41.) He also opined that Claimant's ability to push and pull was affected by her impairments due to the weakness and marked fatigue. (Tr. at 1141-42.) He indicated that Claimant would miss work about

14

three times a month due to her impairments. (Tr. at 1142.)

 Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in assessing the opinions of her treating physicians, Dr. McClung and Dr. Burch. (Document No. 10 at 4-8, 8-10.) Regarding Dr. McClung, Claimant first asserts that contrary to Mauzy v. Astrue, 2010 U.S. Dist. Lexis 31386 (N.D. W.Va.), the ALJ failed to explain how Dr. McClung's RFC was unsupported by his treatment notes. (Id. at 6-8.) Second, Claimant asserts that the ALJ erred in finding that the January, 2008, EMG findings belied Dr. McClung's restrictions because he interpreted the evidence out of context. (Id. at 6-7.) Though Dr. Basamania examined Claimant on March 20, 2007, her first post-op visit, and stated that she had excellent range of motion, Claimant reported pain and tenderness. (Id. at 7.) Dr. Basamania therefore, wanted an EMG, which although it was a normal study, Dr. Wilson, who administered the test, suggested that Claimant's symptoms were due to the past left plexis stress injury. (Id.) Third, Claimant asserts that the ALJ mistakenly found that Dr. McClung's opinion was inconsistent with Claimant's testimony regarding her standing and sitting limitations. (Id.) She further asserts that the ALJ erred in giving greater weight to the opinion of Dr. James Egnor because he was a non-examining consultant who reviewed only four reports and five test results, rather than having treated her for four years as did Dr. McClung. (Id. at 8.)

Regarding Dr. Burch, Claimant asserts that the ALJ erred in giving his opinion "very little weight" based on his treatment notes that reflected Claimant's multiple sclerosis had been inactive for a long period of time, was controlled, and was not a problem. (Document No. 10 at 8-10.) Claimant notes that Dr. Burch opined she was unable to work due to weakness and fatigue caused

by her multiple sclerosis. (Id. at 10.) She asserts that although Dr. Burch indicated her multiple sclerosis was stable, it did not mean that it was "not a problem." (Id.) She further asserts that Dr. Burch recommended immunoregulatory therapy, and therefore, failed to consider her condition as "not a problem." (Id.)

In response, the Commissioner asserts that the medical evidence "strongly supports the ALJ's decision that [Claimant] was not disabled during the period June 13, 2007 through August 12, 2009." (Document No. 15 at 32.) The Commissioner points out that the ALJ appropriately noted that Claimant worked for years with her impairments and for two decades with the diagnosis of multiple sclerosis. (Id. at 34.) He further points out that Claimant's activities also supported the ALJ's decision. (Id. at 34-35.) The Commissioner noted that Claimant did laundry and dishes, shopped, went to the post office and bank, watered flowers, used a computer, fed and walked her dog, and made light meals. (Id. at 34-35.) She also drove a car, did at least light housework, and did some touch up painting. (Id. at 35.)

Regarding Dr. McClung, the Commissioner notes that Dr. McClung noted in June, 2009, that Claimant was doing as best as she had done in some time. (Id. at 39.) He asserts that contrary to Claimant's allegation, the ALJ properly and accurately noted Dr. McClung's July 13, 2009, assessment was not supported by the treatment record and the EMG, which was normal with no evidence of neuropathy. (Id. at 40.) He asserts that the ALJ properly noted that his assessment was even inconsistent with Claimant's testimony concerning her testimony on sitting and standing. (Id.)

Regarding Dr. Burch, the Commissioner asserts that the ALJ properly found that his assessment was not supported by his own treatment notes. (Id. at 37.) The Commissioner also asserts that Dr. Burch's assessment was factually inconsistent with his treatment notes. (Id. at 37-38.) He

16

notes that there was no period of exacerbation of Claimant's multiple sclerosis and that Dr. Burch consistently noted normal neurological examinations. (Id. at 38.) The Commissioner further asserts that Dr. Burch's assessment was an opinion on an issue reserved to the ALJ and was given almost a full year after the date on which the ALJ found Claimant was disabled by application of the grids. (Id.) Accordingly, her asserts that the ALJ properly evaluated the opinions of Drs. McClung and Burch and that his opinion is supported by substantial evidence.

Claimant next alleges that remand is required because the ALJ erred in failing to hold open the record to allow counsel to reconcile Dr. Burch's treatment notes with his RFC, as requested by the ALJ. (Document No. 10 at 10-12.) Claimant notes that after her administrative hearing, the ALJ advised counsel that he usually gave weight to Dr. Burch's opinions, but could not in this case because he could not reconcile the treatment notes with his RFC. (Id. at 10.) The ALJ suggested that counsel contact Dr. Burch. (Id.) Counsel therefore, by letter dated July 28, 2010, requested that the record be held open for a few weeks to await a response from Dr. Burch. (Id.) By letter dated July 29, 2010, the ALJ notified counsel that his request for additional time was denied. (Id. at 10-11.) Claimant asserts that the ALJ's failure to hold open the record is error because pursuant to 20 C.F.R. 416.912(e)(1), the ALJ was required to seek clarification from a medical source if he perceived ambiguity. (Id. at 11.) Consequently, it was not reasonable for him to refuse to delay his decision a few weeks to see if the inconsistency could have been reconciled. (Id.)

Second, Claimant asserts that the ALJ has a responsibility to help develop the evidence. (Id.) She asserts that Dr. Burch responded to counsel's letter of inquiry by letter dated August 4, 2010. (Id.) Dr. Burch explained that multiple sclerosis could have significant disabling symptoms that are unaccompanied by changes in the objective neurological examination. (Id.) Dr. Burch noted that

17

Claimant's health was "quite complex," in that she had chronic cervical and lumbosacral back pain, as well as midthoracic pain. (Id.) The pain and the multiple sclerosis was severely restricting for Claimant. (Id.) Dr. Burch emphasized that Claimant's neurological evaluation did not reflect the degree of her impairment caused by the multiple sclerosis. (Id. at 12.) Claimant therefore, asserts that had the ALJ reviewed Dr. Burch's letter, his opinion would have been affected profoundly. (Id.) She asserts that the Appeals Council erred in its refusal to establish a new onset date or remand so that the ALJ could have considered Dr. Burch's letter. (Id.) Accordingly, Claimant asserts that remand is required for further consideration of Dr. Burch's opinion. (Id.)

The Commissioner does not address Claimant's argument in his brief.

Analysis.

1. Treating Physician Opinions.

Claimant alleges that the ALJ erred in assessing his RFC. (Document No. 17 at 6-8.) The Commissioner asserts that the ALJ's RFC assessment was consistent with the objective medical evidence of record, Claimant's conservative treatment plan, and the medical findings of the examining physicians. (Document No. 19 at 9-12.)

"RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a)

(2009). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. § 416.927(e)(2) (2010).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do.  That is, the SSA need not accept only physicians' opinions.  In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§

404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2010). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s) made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2010). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other

factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2010). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2) (2010). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

In his decision, the ALJ summarized the evidence of record, including the treatment notes and opinions of Drs. McClung and Burch(Tr. at 23-28.) Regarding Dr. McClung, the ALJ noted that he was Claimant's treating physician and summarized his medical reports (Tr. at 26-28.) Regarding his opinions, the ALJ determined that Dr. McClung's assessment was too restrictive and not supported by his treatment notes. (Tr. at 28.) In reaching this decision, the ALJ specifically noted that the EMG findings were benign and physical exams demonstrated normal strength of the bilateral upper extremities. (Id.) Furthermore, the ALJ concluded that Dr. McClung's opinion was inconsistent with Claimant's testimony as to her sitting and standing limitations. (Id.) The ALJ

therefore, accorded Dr. McClung's opinion little weight. (Id.)

The Court finds that the ALJ's decision to accord little weight to Dr. McClung's opinion is supported by substantial evidence. Dr. McClung's treatment notes neither revealed any significant limitations resulting from Claimant's impairments nor significantly abnormal findings, and therefore, the ALJ found that his opinions were inconsistent with his treatment notes. Additionally, as the Commissioner emphasizes, following arthroscopy of her left shoulder, Dr. Basamania noted during a post-op exam Claimant's reports that she was doing well with only mild discomfort in her shoulder and was much better than she was pre-operatively. (Tr. at 26, 596-97, 620.) Following surgery, Claimant presented with tenderness but without instability. (Tr. at 26, 661-62.) Additionally, the state agency consultant, Dr. Egnor, who opined that Claimant was capable of light exertional level work with additional limitations. (Tr. at 27-28, 948-55.) His opinion was consistent with the substantial evidence of record. Furthermore, as the ALJ found, Dr. McClung's opinion was inconsistent with Claimant's alleged limitations in standing and walking. Claimant testified that she could sit comfortably for two hours before she needed to move around. (Tr. at 59.) She also testified that she could stand maybe one hour and walk two hours, depending on the day. (Id.) Dr. McClung opined that Claimant could sit less than two hours and stand or walk less than one hour. The differences in the statements are evident but also seem minimal. Nevertheless, the Court finds that notwithstanding the comparison of the limitations, other evidence supports the ALJ's decision to give little weight to Dr. McClung's opinions. Accordingly, the undersigned finds that Claimant's argument in this regard is without merit.

Regarding Dr. Burch, the ALJ specifically noted his report that her multiple sclerosis had been remarkably stable without specific treatment, as well as the MRI report that supported

longstanding multiple sclerosis but indicated that the disease was not active. (Tr. at 24.) The ALJ also noted that Dr. Burch's neurological examinations essentially were normal and that she was maintained on her own medication regime. (Id.) The ALJ pointed out however, that despite the inactivity of the disease, Claimant had variable symptoms fluctuating in time. (Id.) The ALJ therefore found that in the absence of any significant worsening of Claimant's multiple sclerosis on or after the alleged onset date, the evidence "strongly suggested that this impairment alone would not currently prevent work." (Tr. at 25.) In reaching this conclusion, the ALJ noted that Claimant had worked many years after having been diagnosed with multiple sclerosis. (Id.)

The ALJ also summarized Dr. Burch's opinion and determined that his limitations were too restrictive and not supported by his own treatment notes that reflected that Claimant's multiple sclerosis was inactive, controlled, stable, and not a problem. (Tr. at 28.) Though Dr. Burch based his assessment in part on Claimant's fatigue, the ALJ noted that Claimant did not report such condition until March, 2010. (Id.) The ALJ therefore, accorded little weight to Dr. Burch's opinion. (Id.)

The Court finds that the ALJ's decision to give little weight to Dr. Burch's opinion is supported by substantial evidence of record. As discussed, the evidence of record demonstrated that Claimant suffered from multiple sclerosis that resulted in varying fluctuating symptoms, the disease itself was neither active nor caused limitations as restrictive as Claimant reported. The ALJ identified the inconsistencies between Dr. Burch's opinion and his treatment notes and thoroughly considered the treatment notes themselves. Accordingly, the Court finds that Claimant's argument in this regard is without merit.

2. <u>Motion for Remand</u>.

Claimant also asserts that remand is required to consider a letter from Dr. Burch which purports to explain the discrepancies between his opinions and his treatment notes. (Document No. 10 at 10-11.) Claimant asserts that the ALJ advised counsel after the hearing that he usually gave weight to Dr. Burch's opinions but that in this case, he could not reconcile the treatment notes with his assessed RFC. (<u>Id.</u> at 10.) Counsel therefore, requested that the record be held open for a few weeks to allow Dr. Burch time to respond to counsel's inquiry concerning the discrepancy. (<u>Id.</u> at 10; Tr. 197.) The ALJ denied Claimant's request by letter dated July 29, 2010, and issued his opinion on that date. (Tr. at 18-31, 195.) In his decision, the ALJ stated that he denied counsel's request and noted that counsel had previously contacted Dr. Burch to obtain a medical source statement. (Tr. at 18.) By letter dated August 11, 2010, Dr. Burch explained that patients with multiple sclerosis "can have significant symptoms that are in themselves disabling and yet unaccompanied by any change in the objective neurological examination." (Tr. at 1165-66.) He advised that the most notable symptom is that of fatigue, as it was for Claimant. (Tr. at 1165.) He opined that Claimant's disability was "the result of the sum total of several different health issues in the neurological arena, and indeed in this respect she is quite complex." (<u>Id.</u>) He further opined that Claimant "is totally and permanently disabled from regular gainful employment." (<u>Id.</u>) Dr. Burch emphasized that Claimant's "neurological examination really does not reflect the degree of impairment that the diagnoses create." (Tr. at 1166.)

Claimant asserts that Dr. Burch's letter explained the discrepancy between his treatment notes and his opinions. (Document No. 10 at 10-11.) She asserts that it was unreasonable for the ALJ to have refused to delay his decision a few weeks to determine whether the inconsistency he pointed

out to counsel could have been resolved. (Id. at 11.) Claimant notes that pursuant to 20 § C.F.R. 416.912(e)(1), the ALJ was required to seek clarification from a medical source if her perceived an ambiguity. (Id.) Claimant also notes that the ALJ had a responsibility to help develop the evidence. (Id.) She further asserts that the ALJ erred in refusing to establish a new onset date and remanding the matter for the ALJ to review Dr. Burch's letter. (Id. at 12.)

The Court finds that Claimant correctly points out that the ALJ was required to assist in developing the evidence and must attempt to resolve ambiguities in the record. The ALJ himself advised Claimant's counsel of the inconsistency between Dr. Burch's treatment notes and his opinion. In an attempt to explain the inconsistency, counsel sought additional time to allow Dr. Burch to provide an explanation. The ALJ denied the request and entered his decision forthright. The ALJ's actions belie his duty to attempt to resolve ambiguities in the record. He acknowledged that Dr. Burch typically provides outstanding opinions that he adopts and gives considerable weight. But in this instance, when he found it odd that Dr. Burch's opinions and notes did not add up, he denied Claimant the opportunity to explain the inconsistency. The Court finds that the ALJ's actions are not acceptable in light of the regulations requiring him to resolve ambiguities and assist in developing the record. Accordingly, the Court finds that Dr. Burch's letter explaining the inconsistency between his treatment notes and his opinions, may cause the ALJ to examine his opinions in a different light. Therefore, the Court finds that this matter must be remanded to give further consideration to Dr. Burch's treatment notes and opinions, in light of his explanatory letter dated August 11, 2010.[2]

---

[2] In deciding whether to grant review, the Appeals Council "must consider evidence submitted with the request for review . . . 'if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision.'" Wilkins v. Secretary, 953 F.2d 93, 95-96 (4th

26

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is not supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Remand (Document No. 9.) is **GRANTED**, Defendant's Motion for Judgment on the Pleadings (Document No. 15.) is **DENIED**, the final decision of the Commissioner is **REVERSED**, and this matter is **REMANDED** to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings and is **DISMISSED** from the active docket of this Court.

The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: March 30, 2012.

R. Clarke VanDervort
United States Magistrate Judge

---

Cir. 1991)(*en banc*)(citations omitted). Evidence is "new" if it is not duplicative or cumulative. See id. at 96. "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." Id.  The Regulations governing the circumstances under which the Appeals Council is to review an ALJ decision shows that additional evidence will not be considered *unless* the evidence is new and material and relates to the period on or before the date of the ALJ decision. See 20 C.F.R. §§ 404.1570(b); 404.970(b) (2006). "Pursuant to the regulations . . . , if additional evidence submitted by a claimant does not relate to the time period on or before the ALJ's decision, the evidence is returned to the claimant, and the claimant is advised about her rights to file a new application." Adkins v. Barnhart, 2003 WL 21105103, *5 (S.D. W.Va. May 5, 2003).

The Appeals Council specifically incorporated the evidence from Dr. Burch into the administrative record. As a result, the Court must review the record as a whole, including the additional evidence, in order to determine if the Commissioner's decision is supported by substantial evidence. Wilkins v. Secretary, 953 F.2d 93, 96 (4th Cir. 1991).